UNITED STATES of America

v.

Walter J. BARLOW, Jr., Appellant.

No. 71–1333.

United States Court of Appeals,
District of Columbia Circuit.

Oct. 2, 1972.

As Amended Nov. 17, 1972.

Mr. Richard J. Hopkins, Washington, D. C. (appointed by this court), was on the brief for appellant.

Mr. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, John G. Gill, Jr., and Robert Richard Chapman, Asst. U. S. Attys., were on the brief, for appellee.

Before McGOWAN, LEVENTHAL and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

In a three-count indictment appellant Barlow and three others—William Blackwell, Thomas Fench, and Robert Brown—were charged with (1) theft of United States Government property (18 U.S.C. § 641); (2) receiving, concealing, or retaining stolen United States Government property (18 U.S.C. § 641); and (3) second-degree burglary (D.C. Code § 22–1801(b)). After a jury trial,[1] appellant was found guilty of theft of Government property and second-degree burglary,[2] and was ordered committed for an examination pursuant to Title II of the Narcotic Addict Rehabilitation Act, 18 U.S.C. § 4252. Upon completion of the N.A.R.A. examination he was sentenced to concurrent prison terms of one to three years on each of the two counts. The court ordered appellant to serve six months of his sentence with the remainder of the sentence suspended and appellant placed on three years' probation.

On January 29, 1970, F.B.I. agents were conducting surveillance of William Blackwell. At about 5:25 A.M. on that date, they observed him drive his truck, a white Ford panel truck with "Service" printed on the door on the driver's side,[3] from Glen Arden, Maryland, to his place of business at 617 Rhode Island Avenue, N.E., in the District of Columbia, where he arrived at approximately 6:30 A.M. Shortly thereafter, agents followed Robert Brown as he drove Blackwell's panel truck to the Department of Labor building in the District of Columbia, where Brown parked the truck and entered the

---

1. Appellant, William Blackwell, and Thomas Fench were tried together. Our disposition of their appeals is reported in United States v. Fench, 152 U.S.App.D.C. ——, 470 F.2d 1234 (1972). The fourth codefendant, Robert Brown, entered a plea of guilty to charges of theft of Government property and second degree burglary.

2. William Blackwell and Thomas Fench were both acquitted on the theft and second-degree burglary counts, but they were convicted of receiving, concealing, or retaining stolen Government property. The second-degree burglary count charged:

    FIRST COUNT:
    On or about January 29, 1970, within the District of Columbia, Thomas E. Fench, William H. Blackwell, Walter J. Barlow, Jr., and Robert N. Brown en-

tered the building of the Department of Labor, an agency of the United States, with intent to steal property of another. [D.C.Code § 22–1801(b), 81 Stat. 736]

The theft of Government property count charged:

    SECOND COUNT:
    On or about January 29, 1970, within the District of Columbia, Thomas E. Fench, William H. Blackwell, Walter J. Barlow, Jr., and Robert N. Brown feloniously did steal and purloin one typewriter of the value of $450.00 and one tape recorder of the value of $141.-95, property of the United States of America. [18 U.S.C. § 641, 62 Stat. 725]

3. The Maryland license number of the truck was 5943–ET.

building. An F.B.I. agent observed Brown inside the Labor Department building "moving very fast from one door to the next attempting, trying knobs on each door, and as he would try a knob and push on the door, he would quickly move to the next door."

Approximately ten minutes after Brown entered the Department of Labor building, two F.B.I. agents observed him leave the building, carrying one or possibly two cardboard boxes that appeared to contain heavy items. It was subsequently learned that an I.B.M. typewriter and a Sony tape recorder were missing from two Labor Department offices. These articles were later found where Brown took them.

Brown drove Blackwell's truck back to 617 Rhode Island Avenue, arriving between 8:00 and 8:30 A.M. As soon as the truck pulled into the parking lot, appellant Barlow and William Blackwell appeared at the top of the stairs in front of the building. Brown immediately alighted from the vehicle, walked up the stairs and conversed with them. This conversation was significant and is described later. Thereafter, agents observed Blackwell motion Barlow and Brown down the stairs, and all three "hurried" toward Blackwell's panel truck which was parked within 8 or 10 feet of Barlow's white Pontiac. Barlow proceeded directly to the Pontiac and opened its left rear door, while Brown proceeded to the truck, opened one of its doors, took out a box, carried it to Barlow's car and placed it in the rear seat of that car (the Pontiac). Brown then returned to the truck for the other box. Halfway back to appellant's car, Brown was assisted by Blackwell who appeared to be in an agitated state. Blackwell quickly grabbed one of the flaps on the box Brown was carrying and helped him place it in Barlow's car. Barlow then closed the rear door of his car and became involved in an argument with

Brown that lasted two or three minutes. Appellant then got into his car and drove it out of the lot onto the public street at a normal rate of speed and Brown and Blackwell went back into the building.

Appellant's car was followed by two unmarked vehicles driven by F.B.I. agents. They observed Barlow drive out Rhode Island Avenue toward the Maryland state line. As the agents followed appellant, at times Barlow traveled at high rates of speed, and at one point, without signalling, made a left-hand turn at an intersection and narrowly missed an oncoming dump truck. Agent Goldberg noticed appellant looking in his rear-view mirror several times, apparently aware of the fact that he was being followed. The agents continued to follow appellant and he thereafter turned back toward 617 Rhode Island Avenue. At one corner he drove through a red traffic light. Eventually he drove the car back to the lot at 617 Rhode Island Avenue at a higher than normal rate of speed. He parked his car and entered the building.

Shortly thereafter, Brown and Thomas Fench went to appellant's car and they removed the two boxes—one of which contained the Sony tape recorder and the other the I.B.M. typewriter. They carried the two boxes to a large abandoned warehouse, which was located next to the office building used by Blackwell, where they were arrested. One of the boxes was open, and a typewriter was visible, to which was attached a label bearing a Department of Labor room number and the name of a secretary. The tag read, "Room 222, Labor, Carrico." Appellant was subsequently arrested in front of the 617 Rhode Island Avenue building.

At the trial of appellant, the F.B.I. agents recounted the above-described occurrences.[4] Thereafter, the court denied appellant's motion for acquittal,

---

4. The Government informed the trial court that it also desired to present evidence in its case-in-chief of other suspicious ac-

tivities involving Fench and Brown, and Blackwell's panel truck, which had occurred prior to January 29, 1970. All

and the defendants presented their evidence.

Blackwell denied knowledge of any plan or scheme to steal Government property. He testified that on the morning of January 29, 1970, after Brown drove into the lot, Brown indicated that he had stolen something. (Note Proctor's testimony, *infra*.) Although Blackwell admitted that he became agitated, he denied that he helped move the boxes containing the stolen articles from his truck to appellant's car.

Fench also took the stand. He said that on January 29, 1970, he was an employee of Blackwell. Although he admitted helping Brown carry the two boxes to the abandoned warehouse, located adjacent to Blackwell's place of business, he denied any knowledge of their contents.

Appellant Barlow testified substantially as follows: That on January 29, 1970, he stopped by Blackwell's place of business on Rhode Island Avenue at approximately 7 or 7:30 A.M., to have his car's (Pontiac) brakes repaired by Thomas Fench, one of Blackwell's employees. He said that while he was in Blackwell's office later, Brown entered and stated that "he had [done] something or something had happened." (Note Proctor's testimony, *infra*.) Appellant asked Brown what the problem was, and Brown responded: "There [is] nothing to worry about; everything [is] all right." Appellant surmised that Brown was in trouble. Brown asked appellant if he could use his car to deliver some boxes, and appellant testified that he responded that he would first have to test the condition of his brakes before he could allow Brown to use the vehicle. Appellant said that Brown then transferred the two boxes to the floor of his automobile. Appellant indicated that he asked Brown, "will these boxes get me into any kind of trouble or anything," and Brown responded in the negative. Appellant then drove his car out of the lot, but he denied driving in an evasive manner. He further testified that he could not have exceeded twenty miles per hour on his short trip, due to the condition of his automobile. He also denied that he failed to stop at a red traffic light. When appellant returned to the lot at 617 Rhode Island Avenue, a few minutes after he left, he informed Brown that he had been followed by a strange car and he asked Brown to remove the two boxes from his vehicle. Appellant testified that he told Brown that he did not want to get involved with anything Brown had committed. Appellant refused to move his car to the rear of the building when requested to do so by Brown, but he admitted giving his keys to Brown so that he could get someone else to move the automobile.[5]

James Proctor, a truck driver employed by Blackwell, testified that on January 29, 1970, he observed Brown drive the panel truck into the lot at 617 Rhode Island Avenue sometime between 7:00 and 7:30 A.M. He said that Brown thereafter entered the room in which he and Barlow were located. Brown exclaimed: "They got me." (Weber, Tr. 15, 25). Proctor claimed not to know what Brown was talking about and testified that a short time later Brown asked him to move appellant's car, but he refused to do so.

The sole point raised by appellant on this appeal is that:

The evidence . . . was insufficient to show that he aided and abet-

---

three defendants objected to the introduction of this evidence on the ground that it would be unduly prejudicial and the court sustained these objections. However, it ruled that if Fench took the stand in his own behalf, the Government would be permitted to use the proffered testimony as rebuttal evidence. Although the Government's evidence of past suspicious activities was ultimately admitted in rebuttal, appellant has not challenged the propriety of this admission on appeal. It is important to note here that none of the Government's rebuttal evidence related to the instant appellant.

5. Brown in turn gave the keys to Fench, who moved appellant's vehicle to the back of the building.

ted a second degree burglary and theft of government property because it could only be reasonably inferred from the government's evidence that the Appellant might have committed an act to help the principal offender hide evidence after the crime was completed, thus possibly making the Appellant an accessory after the fact but not an aider or abettor. (Barlow brief, p. 6)

In support of this point appellant argues:

It is submitted that under the facts presented by this Case, it was critical for the government to present evidence of a prior agreement between Barlow and Brown to steal government property, and not merely present evidence from which it could be inferred that Barlow attempted to help Brown hide evidence of a crime that had been committed earlier. Otherwise the distinction between committing the crime of aiding and abetting a principal and committing the crime of being an accessory after the fact (D.C.Code § 22–106) is blurred and confused. This distinction is of critical importance because of the different penalties involved. The District of Columbia Code provides that one who aids and abetts [sic] a principal is punishable as a principal, but one who is an accessory after the fact can be sentenced to only one half of the penalty that might be imposed upon a principal. The District of Columbia Code thus reflects a legislative declaration of policy that an accessory after the fact is less culpable than one who aids and abetts [sic] a principal. (Barlow brief, p. 9)

The above contentions however fail to take into account certain vital evidence and the inferences the jury is permitted to draw from the acts of the parties and Barlow's possession of recently stolen property.

The standards for evaluating a motion for judgment of acquittal are set forth in our accompanying opinion in United

States v. Fench, 152 U.S.App.D.C. ——, 470 F.2d 1234 (1972) and have been stated so frequently and are so well established that they need not be repeated.

Since it is clear that appellant was not present at the Department of Labor building when the actual theft of the typewriter and tape recorder occurred, it is apparent that he could only be convicted of theft of Government property and second-degree burglary as an aider and abettor. *See* Bailey v. United States, 135 U.S.App.D.C. 95, 97, 416 F.2d 1110, 1112 (1969). To be sufficient to support a conviction of aiding and abetting, there must be "evidence that the accused knowingly associate[d] himself in some way with the criminal venture, that he participate[d] in it as in something that he wishe[d] to bring about and that he [sought] by his action to make it succeed." United States v. Lumpkin, 145 U.S.App.D.C. 162, 167, 448 F.2d 1085, 1090 (1971). *See* Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); Long v. United States, 124 U.S.App.D.C. 14, 20, 360 F.2d 829, 835 (1966); Bailey v. United States, *supra*, 135 U.S.App.D.C. at 98, 416 F.2d at 1113. It is therefore essential in upholding an aiding and abetting conviction to determine that there is evidence from which it could reasonably be inferred that the defendant participated in the crime with guilty knowledge. *See* United States v. Harris, 140 U.S.App.D.C. 270, 284 n. 40, 435 F.2d 74, 88 n. 40 (1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971). *See also* White v. United States, 366 F.2d 474, 476 (10th Cir. 1966). It has been held that where the defendant merely provided assistance to the perpetrator of the actual crime *after its completion*—and nothing more—a conviction for aiding and abetting the principal regarding that crime cannot stand. See Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969); United States v. Ferraro, 414 F.2d 802, 804 (5th Cir. 1969); United States v. Varelli, 407 F.2d 735, 749 (7th Cir. 1969). *See also* Bollenbach v. United

States, 326 U.S. 607, 611, 66 S.Ct. 402, 90 L.Ed. 350 (1946). We subsequently analyze the application of this principle to this case.

■ The evidence against Barlow, which on appeal is to be given the most favorable interpretation to support the convictions, disclosed the following facts: (1) that he had known Brown (the thief) since 1959; (2) that he had talked with Brown immediately after Brown returned to the Rhode Island Avenue lot from the Labor Department with the stolen goods in the panel truck; (3) when Brown entered the room in the office at Rhode Island Avenue, Barlow and Proctor were there and Brown at that time said, "I think they got me"; (4) almost immediately thereafter Barlow "hurried" to his Pontiac car which was parked near the panel truck, and opened the left rear door of the car so that Brown could place two boxes containing the stolen typewriter and tape recorder in the back seat; (5) after the boxes were placed in Barlow's car, he closed the car door; (6) Barlow then argued with Brown for several minutes before he (Barlow) got in his car and drove off with the stolen typewriter and tape recorder in the back seat of his car; (7) he then drove out Rhode Island Avenue toward the Maryland state line but apparently soon noticed that he was being followed and began to drive in what could be considered an attempt to evade his followers; (8) at one place he made a left-hand turn without giving any signal and turned closely in front of an oncoming dump truck; (9) thereafter he turned back toward the Rhode Island Avenue lot, drove through a red light and returned to the lot at a high rate of speed, parked his car and went into the office building and asked Brown to remove the boxes from his car and refused to be associated with such removal.

From these facts it is obvious that Barlow drove off with the stolen goods within a few minutes after Brown brought them to the lot. From the rapidity with which Barlow acted after Brown drove onto the lot, and the extent of the active cooperation he gave Brown when he opened his car door to receive the stolen articles and closed it after they were placed therein, it was permissible for the jury to conclude that Barlow's cooperation had been pre-arranged. This was not a required conclusion but it was a permissible one.

The nature and timing of Barlow's acts could also be considered by the jury as indicating that the asportation of the stolen goods, which was an essential part of the theft, was still in progress. The theft had been committed when Brown took the articles and removed them the slightest distance from their location at the Labor Building, but, since larceny is a continuing offense, the asportation element of the offense was still in progress when Brown arrived at the lot with the stolen goods. At that juncture his transfer of the stolen goods to Barlow's car, and the act of Barlow in driving away with them, could well have been considered by the jury as a continuation of the asportation rather than a receipt of stolen property by Barlow. Otherwise stated, it was permissible on the facts of record for the jury to conclude that Brown was fearful that he had been seen ("They got me") and that Barlow knowingly came to his aid in order to assist Brown to secure the fruits of the crime.

It was also permissible for the jury to deduce, from the evidence and from Barlow's actions, that he was well aware that the goods were stolen. He was in the room when Brown came in and said, "They got me" (Weber, Tr. 7, 15). Barlow denied hearing exactly what Brown said, but the jury was free to disbelieve Barlow's testimony in this respect in view of his self-interest, his proximity to Proctor (10 feet), his other denials of prior testimony and Proctor's testimony. This remark alone, made with no further elaboration, could be taken as some indication that Brown considered the parties in the room knew who "They" referred to and what type of activity Brown was engaged in. Barlow's quick

response of going to his car, opening the rear door to receive the stolen goods, closing it after they were placed there, and then driving off the lot, could be considered as confirming this knowledge. Finally, the manner in which he drove his car, after he could have noticed that he was being followed, could be considered as an attempt to evade his followers, i. e., another circumstance from which it could be concluded that he knew the goods were stolen.

Likewise, Barlow's return to the lot on Rhode Island Avenue, after discovering that he was being followed, could be taken as indicating he consciously considered the surroundings where he originally obtained the stolen goods might be more hospitable than being collared redhanded with the stolen goods at some distant place surrounded by F.B.I. agents, and that his return to the place of beginning would indicate less of a crime (and possibly not disclose the intended ultimate receiver) than if he were to continue to the destination he originally planned.

█ It was thus permissible from all the evidence for the jury to conclude, as apparently it did, since it acquitted Barlow of receiving stolen property, that he aided and abetted the larceny by assisting in the continuing asportation of property he knew had been stolen.

█ The crime of which Barlow was convicted (18 U.S.C. § 641), because he aided and abetted it, is basically the common law crime of larceny.[6] This crime requires a wrongful taking and carrying away (asportation) of personal property of another with fraudulent intent to deprive the owner of his property without his consent.[7] The offense is basically one against the right of property, against the right of possession,[8] and for certain purposes, such as venue, is considered to be a continuous offense.[9]

However, it is not necessary here to rely upon any fiction as to a continuing offense because in this case the evidence permitted the jury to find as a *fact* that the asportation, which formed an essential part of the crime, was actually continuing when Barlow took over the stolen goods and continued the asportation. At the moment Barlow took the stolen goods in his car and drove off the crime could be said to be complete in the sense of the word that the perpetrator of the crime had committed all elements necessary to constitute an indictable offense insofar as he personally was concerned but, since he apparently considered that

6. United States v. Anderson, 45 F.Supp. 943 (S.D.Cal.1942) ; 18 U.S.C. § 641 provides :

   § 641. Public money, property or records

   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof ; or

   Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both ; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

   The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater. June 25, 1948, c. 645, 62 Stat. 725.

7. 2 Wharton, Criminal Law and Procedure §§ 447, 480 (Anderson ed. 1957).

8. 50 Am.Jur.2d Larceny §§ 1, 148.

9. The trespass, committed in the original taking, did not, in contemplation of law, divest the true owner of the possession ; and every moment's continuance of the trespass and felony is, in legal consideration, a new caption and asportation.—1 Lead.Cr. Cases, 224. Milam v. State, 240 Ala. 314, 198 So. 863, 866 (1940) ; 2 Wharton, Criminal Law and Procedure §§ 484, 485 (Anderson ed. 1957).

further asportation was necessary in order to secure the fruits of the crime, the crime itself was incomplete in the sense that the actual offense set in motion by the perpetrator was still progressing and had not been terminated or finished. Thus, we recognize that all the elements necessary for an indictable crime had been committed when the articles were moved from their location at the Labor building, but the asportation feature of the crime was still in progress when Brown drove into the lot and quickly transferred the stolen goods to Barlow's car. It was this continuation of the crime by Barlow that permitted him to be charged and convicted as an aider and abettor.

▪ Whether Barlow's continuation of the asportation was prearranged or the result of decisions made on the spur of the moment makes no difference. The evidence permitted a verdict on either basis. If the transfer was prearranged, prior consultation constituted aiding and abetting.[10] And, if there was no prior consultation or agreement, Barlow is still guilty as an aider and abettor because he aided the perpetrator of the crime by *assisting in the continuing asportation* of the property under circumstances from which it was permissible for the jury to conclude he had guilty knowledge of the theft.[11] The aiding and abetting statute includes criminal conduct broader than an unlawful conspiracy and encompasses acts done both before and during the commission of the crime.

> Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy.

Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954); United States v. Varelli, 407 F.2d 735, 749 (7th Cir. 1969).

▪ Barlow is not an accessory after the fact because that is an offense where one "knowing that an offense . . . has been committed, receives, relieves, comforts or assists *the offender* in order to hinder his apprehension, trial or punishment. . . ."[12] (Emphasis added.) The gist of being an accessory after the fact lies essentially in

---

10. 18 U.S.C. § 2(a) provides:

> § 2. Principals
> (a) Whoever commits an offense against the United States or aids, abets, *counsels*, commands, induces or procures its commission, is punishable as a principal. (Emphasis added.)

11. Dye v. State, 77 Ga.App. 517, 48 S.E.2d 742 (1948); Green v. State, 114 Ga. 918, 41 S.E. 55 (1902); Dunlavey v. Commonwealth, 184 Va. 521, 35 S.E.2d 763 (1945); Laminack v. State, 54 Ga.App. 207, 187 S.E. 620 (1936); Good v. State, 21 Okl.Cr. 328, 207 P. 565, 29 A.L.R. 1029 (1922); Brown v. State, 7 Okl.Cr. 678, 126 P. 263, 265 (1912).

12. 18 U.S.C. § 3 provides:

> § 3. Accessory after the fact
> Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.
> Except as otherwise expressly provided by any Act of Congress an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by death, the accessory shall be imprisoned not more than ten years. June 25, 1948, c. 645, 62 Stat. 684.

Government of Virgin Islands v. Aquino, 378 F.2d 540, 552–554 (3d Cir. 1967); State v. McIntosh, 260 N.C. 749, 133 S.E.2d 652 (1963), cert. denied, 377 U.S. 939, 84 S.Ct. 1345, 12 L.Ed.2d 902 (1964); State v. Nicholson, 221 S.C. 399, 70 S.E.2d 632 (1952); 1 Wharton, Criminal Law and Procedure § 112 (Anderson ed. 1957); C.J.S. Criminal Law § 95, pp. 273–275; 21 Am.Jur.2d Criminal Law § 126, p. 200.

obstructing justice by rendering assistance to hinder or prevent the arrest of the offender after he has committed the crime. Evidence of this offense is most frequently found in acts which harbor, protect and conceal the individual criminal such as by driving him away after he commits a murder.[13] The very definition of the crime also requires that the felony not be in progress when the assistance is rendered because then he who renders assistance would aid in the commission of the offense and be guilty as a principal. That is precisely the situation we have here and the jury was fully justified in so concluding. The crime of larceny obviously continues as long as the asportation continues and the original asportation continues at least so long as the perpetrator of the crime indicates by his actions that he is dissatisfied with the location of the stolen goods immediately after the crime and with no more than a few minutes delay causes another to continue the asportation.[14]

A fine analysis of a similar situation appears in Reg v. Campbell (1899) Rap. Jud.Quebec 8 B.R. 322, 2 Can.Crim.Cas. 357:

"In the case of theft, the crime is generally complete when the thief takes and carries away the object which he had formed the design to steal. But the act of carrying the object away may be continued until it is placed somewhere so as not to be found upon him, where it will be securely hidden, and where he can afterwards get it and appropriate it to himself and convert it to his own use. Although the crime may be complete by the mere taking and carrying away of the article, the act of carrying it to a place where it can be concealed and deposited for safe-keeping may enter into the criminal transaction and be a continuation of its commission; and anyone who knowingly assists a thief to conceal stolen property which he is in the actual and proximate act of carrying away renders aid to the actual perpetrator and principal actor and becomes an accessory to the crime, and, under the provisions of the Criminal Code, can be dealt with like as a principal. In this case, the prisoner, according to his own testimony, assisted Coddy in endeavoring to secrete the stolen money, and he aided him afterwards in returning it to him, and, in doing these acts, he became a participator in the criminal transaction and an accomplice in the commission of the offense. He did not become, by his acts, an accessory after the fact, as he did nothing to enable Coddy to escape from justice, and the assistance which he rendered was really in furtherance of the consummation of the theft. While Coddy was feloniously carrying away the money and seeking a place where he could safely conceal it, and was doing what was criminal and what entered into and was a continuance of the offense, although it might have been consummated without such action, the prisoner aided and abetted him by seeking to have the stolen money concealed, and afterwards by returning it to him, and, in so doing, he contributed to the result, and therefore became liable to be convicted for the offense under the indictment found against him. One who knowingly assisted in carrying away or concealing stolen property was formerly dealt with only as an accomplice or accessory at the fact, but such a participator is now deemed a party to the offense and is treated as a principal." 29 A.L.R. 1033.

---

13. Moore v. State, 94 Ga.App. 210, 94 S.E.2d 80 (1956); State v. Potter, 221 N.C. 153, 19 S.E.2d 257 (1942).

14. *Cf.* McDonald v. United States, 89 F.2d 128, 133–134 (8th Cir. 1937) involving the crime of conspiracy to kidnap and its duration until the ransom money is converted to spendable form.

As indicated above we apply a substantially similar process of reasoning and hold that the jury was justified in finding on the evidence here that Barlow's acts were designed to assist Brown in securing the fruits of the crime, not to prevent Brown's arrest, trial and punishment, and that Barlow thereby wilfully and knowingly aided and abetted the theft of Government property and is hence guilty as a principal. We thus sustain his conviction of violating 18 U.S.C. § 641.

■■■ Barlow was also convicted of aiding and abetting second degree burglary.[15] This conviction undoubtedly rested upon an application of the inference from Barlow's exclusive possession of recently stolen property [16] from which the jury was permitted to find "guilty participation in the burglary." [17] This matter is controlled by the decision of the Supreme Court in McNamara v. Henkel, 226 U.S. 520, 33 S.Ct. 146, 57 L.Ed. 330 (1913) where Justice Hughes pointed out the weight and extent of the inference drawn from the possession of recently stolen property such as we have here, where a burglary and larceny are committed and charged together:

> It [was] objected that while possession of property recently stolen may be evidence of participation in the larceny, the apparent possession of the automobile by the appellant affords no support for a conclusion that he committed the burglary, the crime with which he was charged. The permissible inference is not thus to be limited. The evidence pointed to the appellant as one having control of the car and engaged in the endeavor to secure the fruits of the burglarious entry. Possession in these circumstances tended to show guilty participation in the burglary. This is but to accord to the evidence, if unexplained, its natural probative force.

226 U.S. at 524–525, 33 S.Ct. at 147 (Citations omitted).[18] The logic of this decision is impeccable and fully sustains our affirmance of the judgment of conviction on this count.

Judgment accordingly.

---

15. D.C.Code § 22–1801(b) (1970) provides:

(b) Except as provided in subsection (a) of this section, whoever shall, either in the night or in the daytime, break and enter, or enter without breaking, any dwelling, bank, store, warehouse, shop, stable, or other building or any apartment or room, whether at the time occupied or not, or any steamboat, canalboat, vessel, or other watercraft, or railroad car or any yard where any lumber, coal, or other goods or chattels are deposited and kept for the purpose of trade, with intent to break and carry away any part thereof or any fixture or other thing attached to or connected with the same, or to commit any criminal offense, shall be guilty of burglary in the second degree. Burglary in the second degree shall be punished by imprisonment for not less than two years nor more than fifteen years. (Mar. 3, 1901, 31 Stat. 1323, ch. 854, § 823; Dec. 27, 1967, Pub.L. 90–226, § 602, title VI, 81 Stat. 736.)

16. *See* our opinion in the companion case decided today in United States v. Fench, 152 U.S.App.D.C. ——, 470 F.2d 1234 (1972).

17. McNamara v. Henkel, 226 U.S. 520, 525, 33 S.Ct. 146, 57 L.Ed. 330 (1913); Wilson v. United States, 162 U.S. 613, 619, 620, 16 S.Ct. 895, 40 L.Ed. 1090 (1896).

18. Wilson v. United States, 162 U.S. 613, 619, 620, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) is an earlier case discussing the weight of the inference from the possession of recently stolen property on other crimes.